Frost v. New York City Police Department

# United States Court of Appeals
## for the Second Circuit

————————

AUGUST TERM, 2019

(Argued: February 20, 2020      Decided: November 12, 2020)

Docket No. 19-1163

————————

JARRETT FROST,

*Plaintiff-Appellant,*

—v.—

NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY DEPARTMENT OF CORRECTION, THE CITY OF NEW YORK, DISTRICT ATTORNEY ROBERT T. JOHNSON, DISTRICT ATTORNEY ROBERT HERTZ, DETECTIVE MICHAEL LOPUZZO, DETECTIVE RICHARD SPENNICCHIA, DETECTIVE JOSEPH O'NEIL, CORRECTION OFFICER TORRES, CORRECTION OFFICER SORIA, CORRECTION OFFICER CARTY, CORRECTION OFFICER SOUFFRANT, CORRECTION OFFICER TATULLI, CORRECTION OFFICER CAPTAIN MCDUFFIE, CORRECTION OFFICER PREVILLON, CORRECTION OFFICER GONZALEZ, CORRECTION OFFICER CAPTAIN RYAN, CORRECTION OFFICER YOUNG, CORRECTION OFFICER MCLAUGHLIN, CORRECTION OFFICER BARKSDALE, CORRECTION OFFICER CORKER, CORRECTION OFFICER SANCHEZ, CORRECTION OFFICER HILL, CORRECTION OFFICER CAPTAIN CLAYTON JEMMOTT, CORRECTION OFFICER JAY JOYE,

*Defendants-Appellees,*

DETECTIVES JOHN DOE #1–4, Individually and in Their Official Capacity as New York City Police Officers, CORRECTION OFFICERS JOHN DOE #1–5, Individually and in Their Official Capacity as New York City Correction Officers, CORRECTION OFFICER THOMAS,

*Defendants.*[1]

_____

Before: KATZMANN, KEARSE and BIANCO, *Circuit Judges.*

_____

Plaintiff-appellant Jarrett Frost was arrested and charged with murder in January 2011. He was then detained at Rikers Island until a jury acquitted him of all charges in June 2014. After his release, Frost filed a civil rights action against several groups of defendants, including New York City Police Department detectives, New York City Department of Correction officers, and the City of New York. As relevant here, Frost brought claims in the United States District Court for the Southern District of New York for malicious prosecution, due process violations, the use of excessive force, and municipal liability. The district court (Buchwald, *J.*) granted summary judgment in favor of defendants and dismissed Frost's complaint in its entirety.

On appeal, we conclude that the district court correctly dismissed Frost's malicious prosecution claim and one of his excessive force claims, but the district court erred in dismissing Frost's due process claim and two of his excessive force claims. We also conclude that the district court should address the merits of Frost's municipal liability claim in the first instance. Accordingly, the district court's judgment is **AFFIRMED** in part, **REVERSED** in part, and **VACATED** in part, and the case is **REMANDED** for further proceedings consistent with this opinion.

Judge Kearse dissents in part in a separate opinion.

_____

JONATHAN I. EDELSTEIN (Ellie A. Silverman, *on the brief*), Edelstein & Grossman, New York, NY, *for Plaintiff-Appellant*.

CLAIBOURNE HENRY (Richard Dearing, Scott Shorr, *on the brief*), Assistant Corporation Counsel, *for* James E. Johnson,

---

[1] The Clerk of Court is directed to amend the caption as set forth above.

Corporation Counsel of the City of New York, New York, NY,
*for Defendants-Appellees*.
_____

KATZMANN, *Circuit Judge*:

This case arises out of the detention and prosecution of plaintiff-appellant Jarrett Frost. In January 2011, Frost was arrested and charged with the murder of an individual named Mavon Chapman. Frost was then detained at Rikers Island until June 2014, when a jury acquitted him of all charges. After his release, Frost filed a civil rights action in the United States District Court for the Southern District of New York against several groups of defendants, including New York City Police Department ("NYPD") detectives, New York City Department of Correction ("DOC") officers, and the City of New York. As relevant here, Frost brought malicious prosecution and due process claims against the NYPD detectives, excessive force claims against the DOC officers, and municipal liability claims against the City.

After a lengthy discovery period, defendants filed a motion for summary judgment, which the district court granted in a Memorandum and Order dated March 27, 2019. *See Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323 (S.D.N.Y. Mar. 27, 2019). With respect to the malicious prosecution, due

process, and excessive force claims, the district court (Buchwald, *J.*) held that Frost had failed to create a triable issue regarding any individual defendant's liability. *Id.* at *8–12. And because no individual defendant could be held liable, the district court concluded, Frost's municipal liability claims against the City failed as well. *Id.* at *12.

On appeal, we hold that the district court correctly dismissed Frost's malicious prosecution claim and one of his excessive force claims, but the district court erred in dismissing Frost's due process claim and two of his excessive force claims.[2] We also conclude that the district court should address the substance of Frost's municipal liability claims in the first instance, as certain individual defendants now face potential liability. Accordingly, the district court's judgment is **AFFIRMED** in part, **REVERSED** in part, and **VACATED** in part, and the case is **REMANDED** for further proceedings consistent with this opinion.

---

[2] As discussed below, the district court correctly dismissed the excessive force claim arising out of the January 16, 2013 incident, but it erred in dismissing the claims arising out of the October 9, 2012 and July 16, 2013 incidents.

BACKGROUND

## I.     The Murder of Mavon Chapman

Mavon Chapman was shot and killed in the early morning hours of July 6, 2010. The shooting took place at the corner of East 149th Street and Morris Avenue in the Bronx, one block from the apartment building where Frost lived. Approximately 24 hours prior to the shooting, Frost had been assaulted in the same area by members of a neighborhood gang, some of whom were friends of Chapman's.

Shortly after Chapman was killed, defendants Detectives Michael Lopuzzo, Richard Spennicchia, and Joseph O'Neil were assigned to investigate the murder. They interviewed several witnesses to the shooting, including non-party Leon Vega, who was one of the gang members who assaulted Frost the day before. None of the witnesses could identify the shooter, but they told the detectives that the shots had come from the direction of the apartment complex where Frost lived. Vega was interviewed twice on the day of Chapman's murder, and during his first interview he told detectives that he did not know who had shot Chapman or where the shots had come from. During his second interview, however, Vega said that the shots had come from a doorway leading to a stairwell in Frost's apartment

complex and that a black male wearing a white t-shirt had been standing in the doorway at the time of the shooting.

In the hours following Chapman's murder, O'Neil and Spennicchia visited the crime scene and recovered surveillance footage from the stairwell described by Vega. The footage showed two black males walking down the stairs and then running back up immediately after Chapman was shot. One of the men, later identified as non-party John McLaurin, was wearing a white tank top and jeans. The other, later identified as Frost, was wearing a green t-shirt and tan shorts.

The next day, July 7, O'Neil and Spennicchia picked Frost up at school to question him. At the time, the detectives considered Frost to be a witness. Frost admitted that he had been in the stairwell with McLaurin when Chapman was shot, but he told the detectives that McLaurin had fired the gun. The detectives did not arrest Frost, and they chose instead to look for McLaurin, whom they were unable to locate.

Six months passed without any major developments regarding Frost. Then, on January 6, 2011, O'Neil and Spennicchia learned that Vega had been arrested for an unrelated crime and wanted to enter into a cooperation agreement in exchange for information about Chapman's murder. The detectives went to

6

observe an interview with Vega at the Bronx District Attorney's Office and to show Vega photo arrays. The detectives, Vega, and an assistant district attorney were present at the interview, as was Vega's defense counsel.

During the interview, Vega identified Frost from one of the photo arrays as the individual who shot Chapman. Three days later, in an apparent coincidence, Spennicchia saw McLaurin on the street, and the detectives brought him in for an interview. Like Vega, McLaurin told the detectives that Frost was responsible for the shooting. And according to McLaurin, Frost admitted that he had killed Chapman in retaliation for the previous day's assault.

On January 13, 2011—one week after Vega's interview—Frost was arrested on charges of murder in the second degree, manslaughter with intent to cause physical injury, and criminal possession of a weapon in the second degree. The following day, Frost was arraigned and remanded to Rikers Island, and he was indicted shortly thereafter. Frost remained incarcerated at Rikers until a jury acquitted him of all charges on June 24, 2014.

## II. Frost's Detention at Rikers Island

During his nearly three-and-a-half-year detention at Rikers, Frost received numerous disciplinary infractions, and he was involved in multiple physical

altercations with correction officers and inmates. Indeed, Frost's transgressions earned him a "Red ID" classification, which is given to inmates who are violent or are caught with weapons. Although the record below describes Frost's misbehavior in considerable detail, only the following three incidents are relevant to the instant appeal.

The first incident took place on October 9, 2012, when Frost was brought to Bronx Supreme Court for an attorney visit. While there, Frost was escorted by defendant Correction Officer Captain Clayton Jemmott, and defendant Correction Officer Jay Joye was also present. According to Jemmott, Frost became combative and said, "I should spit in your fuckin' face." J.A. 609:16–17. In response, Jemmott took Frost to the ground and either Jemmott or Joye kicked Frost in the ribs. Jemmott and Joye then dragged Frost on the ground by his leg shackles. Later that day, Frost was taken to a medical clinic, where he was diagnosed with a ruptured eardrum and bruising on his forehead and cheek.

The second incident took place on January 16, 2013, while Frost was housed in the Central Punitive Segregation Unit ("CPSU"). As Frost was returning to the CPSU from court, he was strip searched by defendant Correction Officer Hill. After Frost removed his clothing, Hill observed a bag of contraband cheese on the

8

floor, and Hill also reported seeing a small object wrapped in black plastic. Frost turned over the cheese, but he did not relinquish the small object, which Hill reportedly saw Frost secrete in his anal cavity. Hill informed his supervisor of these events, and defendant Correction Officer Captain Ryan was assigned to lead an extraction team to recover the secreted object. Ryan assembled a team that included defendants Correction Officers Young, McLaughlin, Barksdale, Corker, and Sanchez.

When Ryan's team went to begin the extraction, Ryan first spoke with Frost for 10 to 15 minutes and ordered Frost to return the contraband. After Frost refused to turn anything over, Ryan's extraction team entered the intake search area where Frost was located. Video footage of the extraction shows that Frost resisted the officers and tried to prevent them from entering the area by holding the door shut. Officers then struggled to restrain Frost for several minutes. After being restrained, Frost was taken to a cell where he was ordered to squat, after which a blade wrapped in electrical tape was recovered from the floor. Frost sustained bruises from the extraction. He later pled guilty to promoting prison contraband in the second degree in connection with the incident. As part of his plea allocution, Frost specifically admitted to possessing the blade.

The third and final incident relevant to this appeal took place on July 16, 2013, when Frost and eighteen other inmates refused to leave the CPSU recreation yard and return to their cells. Defendant Correction Officer Captain McDuffie and other correction officers spent seven hours trying to convince Frost and his fellow inmates to come back inside, but the inmates refused. Eventually McDuffie was authorized to extract Frost from the recreation yard, and he formed an extraction team that included defendants Correction Officers Soria, Previllon, Souffrant, Carty, Tatulli, and Gonzalez.

Video footage shows that when the extraction team arrived at Frost's pen in the recreation yard, Frost was positioned in a charging stance and had ripped his clothing to make elbow pads and a mouth guard. When the extraction team opened the door to the pen, Frost charged the officers and ended up on top of one of them. An extended struggle ensued, with the officers eventually restraining Frost. After Frost was restrained, the video footage appears to show one of the members of the extraction team repeatedly moving his knee toward Frost's head. At this time, other inmates can be heard in the background yelling for the officer to stop kicking Frost in the head. As a result of the episode, Frost sustained a black eye, as well as cuts and scrapes to his forehead, wrists, and hand.

### III. Procedural History

Frost remained incarcerated at Rikers until a jury acquitted him of all charges in June 2014. Frost then commenced the underlying action on June 22, 2015, and the operative complaint was filed on February 5, 2016. As relevant here, Frost brought the following claims under 42 U.S.C. § 1983: (1) malicious prosecution against the City and Detectives Spennicchia, O'Neil, and Lopuzzo; (2) excessive force against all DOC officers except Correction Officer Gonzalez; (3) substantive due process against all individual defendants; and (4) municipal liability against the City. *See Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323, at *1 (S.D.N.Y. Mar. 27, 2019). Frost also brought several state law claims against different combinations of defendants. *Id.*

On July 10, 2018, defendants moved for summary judgment. Frost opposed the motion, and he submitted a declaration from Leon Vega dated September 13, 2018. As noted above, Vega had failed to identify Chapman's killer when he was first questioned by detectives on July 6, 2010, but he later pinned the shooting on Frost during his January 6, 2011 interview at the Bronx District Attorney's Office. According to his 2018 declaration, Vega falsely identified Frost in 2011 because he was facing a felony charge, and Detectives Spennicchia and O'Neil made clear to

11

Vega that he would need to identify Frost as the shooter in order to get a deal. The truth, Vega stated, was that he had seen Frost standing in the stairwell from which Chapman was shot, but Frost had not pulled the trigger. Instead, the shooter was a second individual who was wearing a white shirt, but whom Vega was unable to identify. Vega explained that he "would never have identified Frost as the shooter if the detectives hadn't told [him] to do so," and he asserted that "when Frost came to trial, [Vega] refused to testify against him because [he] did not want to continue a lie." J.A. 1603 ¶¶ 19–20.

Notwithstanding Vega's declaration, the district court granted defendants' motion for summary judgment and dismissed Frost's complaint in its entirety. *See Frost*, 2019 WL 1382323, at *12. Beginning with the malicious prosecution claim, the district court rejected Frost's argument that the NYPD detectives had commenced a criminal proceeding against him by coercing Vega's identification. In the district court's view, Vega's declaration was "'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit' his allegation," *id.* at *8 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)),[3] and prosecutors from the

___

[3] Unless otherwise indicated, in quoting cases, all internal quotation marks,

12

Bronx District Attorney's Office had been present at all relevant interviews and had made an independent decision to initiate proceedings against Frost, *id.* at *9. Furthermore, the district court reasoned, even if the detectives had commenced a criminal proceeding against Frost by coercing Vega's identification, there was probable cause to prosecute Frost based on his undisputed presence in the stairwell from which Chapman was shot, McLaurin's testimony identifying Frost as the shooter, and Frost's motive to retaliate for the previous day's assault. *Id.*[4]

Moving to Frost's excessive force claims, the district court held that Frost did not raise a triable issue with respect to the three incidents discussed above. Regarding the October 9 incident, the district court reasoned that Frost had established himself as a violent inmate and that Jemmott and Joye responded reasonably to Frost's threat to spit on Jemmott. *Id.* at *10. As to the January 16 incident, the district court held that video footage of the extraction showed that the DOC officers used reasonable force and inflicted only de minimis injuries. *Id.* at *11. Likewise, for the July 16 incident, the district court held that video footage

---

alterations, emphases, footnotes, and citations are omitted.

[4] Because the district court found that there was probable cause to prosecute Frost, it also found that there was no triable issue as to whether defendants acted with malice. *Frost*, 2019 WL 1382323, at *9 n.27.

showed as a matter of law that the force used to extract Frost from the recreation yard and the minor injuries that he sustained were not excessive. *Id.*[5]

Finally, the district court held that Frost failed to create a genuine dispute regarding his substantive due process claim because he failed, inter alia, to show that the NYPD detectives "provide[d] false information likely to influence a jury's decision and forward[ed] that information to prosecutors." *Id.* at *12. The district court also held that Frost's municipal liability claims against the City failed because his underlying claims against individual defendants failed. *Id.* And because the district court dismissed Frost's federal claims, it declined to exercise supplemental jurisdiction over his remaining state law claims and accordingly dismissed those claims without prejudice. *Id.*

The district court entered judgment on March 28, 2019, and Frost timely appealed.

---

[5] The district court also held that Frost failed to create a triable issue with respect to an incident that took place on July 25, 2012. *Id.* at *9–10. Frost does not challenge that decision on appeal.

## DISCUSSION

### I. Standard of Review

"We review orders granting summary judgment de novo and focus on whether the district court correctly concluded that there was no genuine dispute as to any material fact and that the moving party was entitled to judgment as a matter of law." *Chunn v. Amtrak*, 916 F.3d 204, 207 (2d Cir. 2019). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

## II.    Malicious Prosecution

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 161.

The district court dismissed Frost's malicious prosecution claim after concluding that defendants did not initiate a criminal proceeding against Frost and that, in the alternative, Frost's prosecution was supported by probable cause. *See Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323, at *8–9 (S.D.N.Y. Mar. 27, 2019). While acknowledging that police officers can initiate criminal proceedings by "creat[ing] false information and forward[ing] it to prosecutors," *id.* at *8; *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997), the district court held that no reasonable juror would credit the allegations

16

in Vega's declaration that defendants had coerced him into identifying Frost, *Frost*, 2019 WL 1382323, at *8. The district court also reasoned that prosecutors from the Bronx District Attorney's Office made an independent decision to initiate proceedings against Frost, thus absolving defendants of liability. *Id.* at *9. And with respect to probable cause, the district court concluded that Frost's prosecution was justified by his undisputed presence at the scene of the crime, McLaurin's identification of Frost as the shooter, and the fact that Frost had a motive to retaliate for the previous day's assault. *Id.*[6]

For the reasons discussed below in the context of Frost's due process claim, we hold that the district court erred in discrediting Vega's declaration at the summary judgment stage. We nevertheless agree with the district court that there was probable cause to prosecute Frost, even without Vega's identification. And because "the existence of probable cause is a complete defense to a claim of malicious prosecution," *Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013), we conclude that the district court was correct to dismiss Frost's claim.[7]

---

[6] The district court also held that Frost failed to raise a triable issue as to malice because there was probable cause to prosecute him. *Frost*, 2019 WL 1382323, at *9 n.27.

[7] Because the existence of probable cause is dispositive of Frost's malicious

"Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).[8] We have recognized that, in general, "[p]robable cause is a mixed question of law and fact." *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017). In a case such as this one, however, "where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).

As the district court explained, the following facts are undisputed: First, defendants recovered surveillance footage showing Frost and McLaurin walking down and then running up the stairwell from which Chapman was shot,

prosecution claim, we need not decide whether prosecutors made an independent decision to initiate proceedings against Frost, thereby absolving defendants of liability. We also need not decide whether Frost raised a triable issue as to malice.

[8] "Even in the absence of probable cause, a police officer is entitled to qualified immunity where (1) her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for her to believe that her actions were lawful at the time of the challenged act." *Betts v. Shearman*, 751 F.3d 78, 82–83 (2d Cir. 2014). However, "the defense of qualified immunity can . . . be forfeited," *Fabrikant v. French*, 691 F.3d 193, 211–12 (2d Cir. 2012), and defendants have failed to raise it before this Court in the context of Frost's malicious prosecution claim.

immediately after Chapman was shot. Second, Frost admitted to defendants that he was in the stairwell with McLaurin when Chapman was shot, and McLaurin identified Frost as the shooter. And third, defendants were aware that Frost had a motive to retaliate against Chapman because Frost had been assaulted by Chapman's friends the night before. Given these undisputed facts, we conclude as a matter of law that a reasonably prudent person would have been led to believe that Frost was guilty of shooting Chapman. *See Boyd*, 336 F.3d at 76.[9]

Frost resists this conclusion, and he cites our decision in *Dufort v. City of New York*, 874 F.3d 338 (2d Cir. 2017), for the proposition that an individual's presence at the scene of a crime and his identification by a fellow suspect are insufficient to establish probable cause. But *Dufort* is inapposite. As relevant here, *Dufort* involved an attack by multiple assailants, and the plaintiff was arrested "based on little more than a witness's statement that he" was one of several people present who wore a similar shirt to one of the attackers. 874 F.3d at 350. The plaintiff was also identified by a co-defendant who was facing a possible prison sentence of fifty years to life, and who testified only equivocally that he thought the plaintiff

---

[9] Because the undisputed facts support a finding of probable cause, we need not address whether Frost's indictment created a presumption of probable cause. *See Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).

participated in the attack. *Id.* at 351. In the instant case, by contrast, surveillance footage unambiguously places Frost in the stairwell from which the shots were fired. Furthermore, McLaurin—who was not arrested in connection with Chapman's murder—unequivocally identified Frost as the shooter.

Frost's position is further undermined by analogous cases in which we have held that an individual's presence in the location from which shots are fired can support a finding of probable cause. In *Thomas v. City of New York*, 562 F. App'x 58 (2d Cir. 2014), we held that there was probable cause to arrest the plaintiff where "the facts available . . . at the time of the arrest included (1) evidence that [the victim] was shot at close range; (2) [the victim's] photo array identification of [the plaintiff] as the individual who walked by him on an otherwise empty street moments before he was shot; and (3) [the victim's] statement that, after he was shot, he turned and saw [the plaintiff] standing on the sidewalk in the direction of the continued gunfire." *Id.* at 59–60. We explained that probable cause existed even though the victim did not see whether the plaintiff was holding a gun. *Id.* at 60. Likewise, in *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124 (2d Cir. 2009), we held that there was probable cause to arrest the plaintiff "[g]iven the undisputed facts . . . that shots were suddenly fired, that [an officer] saw [the

plaintiff] when he looked in the direction from which the shots had been fired, that [the plaintiff] was standing alone, and that [the plaintiff] promptly turned around and proceeded" in the direction from which the shots came. *Id.* at 127. Again, we made clear that probable cause did not depend on "whether or not [the officer] actually saw a gun." *Id.*

Here, there is no dispute that Frost was present in the location from which Chapman was shot, at the time that Chapman was shot. Viewed in light of *Thomas* and *Husbands*, these facts alone tend to weigh in favor of a finding of probable cause. And although the plaintiffs in *Thomas* and *Husbands* were by themselves, whereas Frost was with McLaurin, we conclude that McLaurin's identification of Frost and Frost's retaliatory motive compensate for any reduction in probable cause that this distinction introduces. With respect to this latter point in particular, Frost offers no reason to discount the significance of his motive. Instead, he makes only the conclusory assertion that his "alleged motive . . . is . . . insufficient" to support a finding of probable cause. Appellant's Br. 32. Because we believe that Frost's motive is significant, and because the undisputed facts, taken together, would have led a reasonably prudent person to believe that Frost shot Chapman,

we conclude that Frost's prosecution was supported by probable cause. The district court was therefore correct to dismiss his malicious prosecution claim.

## III. Due Process

The Due Process Clause guarantees a criminal defendant's "right to a fair trial." *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010). This right is violated "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Such violations are "redressable in an action for damages under 42 U.S.C. § 1983." *Id.* And unlike a malicious prosecution claim, "a Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016).

In the proceedings below, Frost alleged substantive due process violations against all individual defendants. *See Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323, at *1 (S.D.N.Y. Mar. 27, 2019). The only violations relevant to the instant appeal, however, are those alleged against the NYPD detectives. Specifically, Frost argues that the detectives deprived him of due

process by coercing Vega into identifying him as the shooter and by giving this evidence to prosecutors, who used it to seek Frost's detention at Rikers Island and to bring him to trial on the underlying charges.[10]

Although the district court did not discuss Frost's due process argument in detail, it suggested that the claim failed because there was no evidence that the NYPD detectives "provide[d] false information likely to influence a jury's decision and forward[ed] that information to prosecutors." *Id.* at *12. This suggestion followed from the district court's earlier conclusion, in the context of Frost's malicious prosecution claim, that there was no genuine dispute as to whether defendants coerced Vega into falsely identifying Frost because Vega's declaration was "'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit' his allegation." *Id.* at *8 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)). On appeal, Frost argues that the district court erred both in discrediting Vega's

---

[10] Frost also argues that the detectives deprived him of due process by failing to forward exculpatory evidence to prosecutors. Because we reverse the dismissal of Frost's due process claim on other grounds, and because the district court did not address Frost's exculpatory evidence argument below, we leave this argument for the district court to resolve in the first instance.

declaration at the summary judgment stage and in dismissing Frost's due process claim as a result. For the reasons below, we agree.

It is a bedrock rule of civil procedure that "a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." *Agosto v. INS*, 436 U.S. 748, 756 (1978). In *Jeffreys v. City of New York*, however, we recognized a narrow exception "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." 426 F.3d at 554. In such an extraordinary case, we said, "it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Id.*

Relying on our decision in *Jeffreys*, the district court concluded that multiple aspects of Vega's declaration rendered his allegations incredible. First, the district court observed that "[t]he scant, three-page declaration . . . was signed more than three years after plaintiff and his counsel filed this instant action, six months after the discovery period concluded, and two months after defendants filed their summary judgment motion." *Frost*, 2019 WL 1382323, at *8. More significantly, the district court noted that Vega's declaration "omits the undisputed and

24

determinative fact that Vega's attorney and an ADA were present at his interview with the detectives." *Id.* The district court emphasized with respect to this latter point that "Vega's assertion, if true, would mean that the two attorneys present during the interview, in violation of their ethical and legal obligations, condoned, countenanced and permitted the detectives to coerce Vega into testifying falsely." *Id.*

On appeal, Frost argues that the district court erred in applying *Jeffreys* beyond its scope. Frost contends that Vega's declaration was "consistent and uncomplicated," Appellant's Br. 21 (quoting *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019)), unlike the plaintiff's self-serving testimony in *Jeffreys*. Frost also asserts that Vega's declaration is corroborated by his initial inability to identify Chapman's shooter when detectives first questioned him on July 6, 2010. And while Frost acknowledges that Vega's "declaration implies that Vega's attorney and the ADAs acted unethically," he notes that "it is hardly unheard-of for prosecutors to act overzealously in pursuit of a conviction or for a witness' counsel to go along with such overzealousness if it benefits his client." *Id.* at 23.

In response, defendants offer several reasons why they believe the district court correctly disregarded Vega's "eleventh-hour declaration." Appellees' Br. 24.

25

As relevant here, defendants argue that the declaration is inconsistent with Vega's initial police interviews, which did not clearly exculpate Frost or inculpate the individual (presumably McLaurin) who was wearing the white shirt. Defendants also contend that there is an internal inconsistency between Vega's acknowledgement, on the one hand, that he initiated contact with the Bronx District Attorney's Office in January 2011, and his allegation, on the other, that he was coerced into identifying Frost at the ensuing interview. Likewise, defendants assert that Vega's statement in his declaration that "he 'refused to testify against [Frost] because [he] did not want to continue a lie'" is unsupported by the record given that Vega "made no effort on the witness stand to recant his original identification of Frost as the shooter." *Id.* at 27 (quoting J.A. 1603 ¶ 20) (alterations in original). And finally, defendants reiterate the district court's concern that Vega's declaration alleges ethical and legal violations by the attorneys present at his January 2011 interview.

Although we are sympathetic to some of defendants' criticisms, we nevertheless agree with Frost that the district court extended *Jeffreys* too far. As we have said, the *Jeffreys* exception is narrow, and it applies only "in the rare circumstance where" a witness's testimony is so problematic that no reasonable

juror could credit it. *Jeffreys*, 426 F.3d at 554. Where, by contrast, "there is a plausible explanation for discrepancies in a [witness's] testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Id.* at 555 n.2. And "[i]n the ordinary case where a district court is asked to consider the contradictory deposition testimony [or declaration] of a fact witness, or where the contradictions presented are not real, unequivocal, and inescapable, the general rule remains that a district court may not discredit a witness's deposition testimony [or declaration] on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) (per curiam).

Here, Vega's declaration presents us with an "ordinary case," not a "rare circumstance." It is true that the document was introduced late in the proceedings below and that the substance of Vega's allegations is somewhat meager. These deficiencies, however, are not serious enough to render the declaration incredible as a matter of law. Defendants cite prior decisions from this Court for the proposition that "witnesses are not permitted to raise a sham issue of fact by

27

submitting a blatantly manufactured affidavit that contradicted a prior statement." Appellees' Br. 29 (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)); *see Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). But even assuming that the "sham issue of fact" doctrine applies where the witness's prior statements are unsworn, years-old police interviews, Vega's declaration is not sufficiently "manufactured" or contradictory to bring it within the doctrine's ambit.

Contrary to defendants' characterization, there is a plausible explanation for any discrepancies between Vega's 2018 declaration and his earlier interviews with law enforcement. Take Vega's statement in 2018 that Frost did not kill Chapman. Obviously, this is inconsistent with Vega's identification of Frost as the shooter during his January 2011 interview at the Bronx District Attorney's Office. But the inconsistency between Vega's earlier and later positions does not make them irreconcilable. Instead, Vega's declaration offers a plausible account of his evolving story: in 2011, he was facing a felony charge and wanted to make a deal with prosecutors, and by 2018 he had changed his mind and decided that he wanted to tell the truth. To conclude, as we do, that the explanations are plausible

28

is not to say that we make any judgment as to whether they will carry the day; we determine only that this issue cannot be resolved at the summary judgment stage.

We are conscious of the concerns raised by defendants and the district court that Vega's declaration, if true, describes ethical and legal violations by his defense counsel and the assistant district attorney who interviewed him. And we certainly have no reason to think that such violations are anything but rare. But we cannot conclude as a matter of law that allegations of attorney misconduct are too implausible to create a genuine dispute of material fact. Indeed, if we were to adopt such a conclusion, entire categories of lawsuits would be precluded from making it past summary judgment.

Nor is Vega's declaration irreconcilable with the two initial interviews that he had with law enforcement on the day of Chapman's murder. As noted above, Vega first told detectives that he did not know who shot Chapman or where the shots came from, and he later said that the shots came from Frost's apartment building and that a man wearing a white shirt was standing in the doorway from which the shots came. Defendants argue that these statements contradict Vega's more definitive assertion in his declaration that the man in the white shirt was the shooter. But we see no necessary contradiction—let alone a contradiction that is

29

"real, unequivocal, and inescapable," *Fosamax*, 707 F.3d at 194 n.4—between

Vega's statement in 2018 that the man in the white shirt was the shooter and his

statement in 2010 that the man in the white shirt was standing in the building

doorway from which the shots were fired. And while there may be inconsistencies

between Vega's first and second interviews in the hours immediately following

Chapman's murder, these discrepancies at most raise garden variety credibility

issues regarding Vega's initial account. They do not provide grounds for the

district court to disregard Vega's later declaration on a motion for summary

judgment. *See Jeffreys*, 426 F.3d at 555 n.2.

Finally, we are not persuaded by defendants' argument that Vega's

declaration was properly discredited based on its internal inconsistencies and lack

of support in the record. Defendants suggest that Vega would not have initiated

contact with the Bronx District Attorney's Office in January 2011 if he had not

already intended to identify Frost. And they imply that Vega would have recanted

his false identification at Frost's trial if he had really been motivated by a desire to

tell the truth. But these assumptions, while plausible, are not self-evident, and they

certainly are not fatal to the credibility of Vega's declaration. There are any number

of benign or malign explanations for the purported deficiencies raised by

defendants, and it is not the role of the district court to choose among them at the summary judgment stage. Instead, as even Frost acknowledges, the most appropriate use for defendants' criticisms is as "fodder for cross-examination of Vega at trial." Reply Br. 6.

We conclude, therefore, that Vega's declaration does not present the kind of "rare circumstance" contemplated by *Jeffreys*, and that the district court erred in discrediting it.[11] Defendants nevertheless argue that we should affirm the district court's dismissal of Frost's due process claim because, even assuming that Vega's identification was coerced, Frost has failed to raise a triable issue as to whether the identification resulted in a deprivation of his liberty. Specifically, defendants contend that "there was sufficient evidence to prosecute Frost without Vega's identification" and that Frost "has never argued that, but for Vega's identification, he would not have been indicted and incarcerated during the course of his trial." Appellees' Br. 40.

---

[11] In our analysis, we have assumed without deciding that *Jeffreys* applies to the testimony of non-party fact witnesses. Because we conclude that it was error to discredit Vega's declaration even under the *Jeffreys* standard, we need not address Frost's broader contention that district courts may never discredit non-party fact witness testimony at the summary judgment stage.

Defendants' argument falls short for two reasons.[12] First, as noted above, probable cause is not a defense to a fair trial claim based on the fabrication of evidence. *See Garnett*, 838 F.3d at 277–78. Instead, even if "a privileged arrest accounted for at least some portion of the deprivation of [a § 1983 plaintiff's] liberty," the plaintiff may still "suffer[] a deprivation of liberty as a result of [an] officer's fabrication." *Id.* at 277. It is therefore irrelevant that "there was sufficient evidence to prosecute Frost without Vega's identification." Appellees' Br. 40.

Second, defendants miss the mark in their assessment that Frost has not raised a triable issue regarding causation. As we have explained, a "prosecutor's decision to pursue charges rather than to dismiss [a] complaint without further action[] may depend on the prosecutor's . . . assessment[] of the strength of the case, which in turn may be critically influenced by fabricated evidence." *Garnett*, 838 F.3d at 277. Here, a reasonable jury could have found that Vega's identification "critically influenced" the decision to prosecute Frost. *See id.* It is undisputed that defendants knew the day after Chapman's shooting that Frost was standing with

---

[12] As with Frost's malicious prosecution claim, defendants do not raise a qualified immunity defense. Even if they did, however, such a defense would fail, as "there is a clearly established constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity." *Garnett*, 838 F.3d at 276.

McLaurin in the stairwell from which the shots were fired and that Frost had been assaulted the night before by Chapman's friends. For six months, however, defendants took no action, and it was only after Vega identified Frost as the shooter that Frost was arrested and prosecuted. This sudden change suggests that Vega's identification was influential. And while it is true that McLaurin also identified Frost between the time of Vega's interview and Frost's arrest, a reasonable jury could have found that the decision to prosecute Frost would have been different if McLaurin, who was Frost's fellow suspect, was the only person to identify him. This is all that is necessary to sustain Frost's due process claim.

The dissent would hold otherwise on this point. The dissent notes, as we do, that independent evidence was sufficient to create probable cause for Frost's pretrial detention. The dissent also finds great significance in the fact that Vega's purportedly coerced identification did not taint Frost's trial itself, because Vega refused to testify that Frost was the shooter. The dissent thus argues that Frost's "fair trial" claim under the Due Process Clause fails as a matter of law.

We respectfully think our precedents are to the contrary. Notwithstanding the nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself. Indeed, a criminal defendant can bring a fair trial claim

even when no trial occurs at all. Our decision in *Ricciuti* is illustrative in this respect. One of the plaintiffs there, Alfred Ricciuti, was arrested and charged with second-degree assault after a post-Yankees-game altercation. 124 F.3d at 125–26. Ricciuti alleged that one of the defendant police officers, Lt. Robert Wheeler, fabricated a confession statement and forwarded it to the Bronx district attorney, who subsequently added a charge against Ricciuti for second-degree aggravated harassment. *Id.* at 126.

Although all charges against Ricciuti were dismissed before trial, *id.* at 127, we held that there was a genuine issue of fact as to whether Lt. Wheeler and other defendant officers had knowingly fabricated and forwarded a false confession to prosecutors, *id.* at 129–30. As noted above, we explained that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Id.* at 130. And we concluded that "a reasonable jury could find, based on the evidence, that defendants . . . violated [Ricciuti's] clearly established constitutional rights by conspiring to

34

fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict." *Id.*

The dissent nevertheless argues that, because the charges against Ricciuti were dismissed before trial, his claim is more accurately described as a malicious prosecution claim under the Fourth Amendment, rather than a fair trial claim under the Due Process Clause. *Post* at 4–5. According to the dissent, the real constitutional claim in *Ricciuti* was that, although there was probable cause to believe an assault had occurred, there was no probable cause "for magnifying the charge to a crime of bias, which was the only basis for keeping plaintiffs detained." *Id.* at 5. However, this interpretation is hard to square with our decision in *Ricciuti* itself, which analyzed the question of probable cause at length in the context of Ricciuti's *other* claims, *see* 124 F.3d at 127–29, 130–31, but did not so much as mention it in the context of his fair trial claim, *id.* at 129–30. We cannot conclude that the *Ricciuti* decision "mislabel[ed] the claim it was upholding." *Post* at 5. Rather, the court employed an entirely different mode of analysis than the malicious-prosecution framing that the dissent now urges.

We respectfully believe that the dissent's interpretation of our fair trial precedent is also foreclosed by *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000), where

35

the court again recognized a fair trial claim in a similar circumstance. The plaintiff there, Zaher Zahrey, was prosecuted for conspiracy to commit robberies, among other counts, and was detained without bail for eight months. *Id.* at 346. In his § 1983 suit against various police officers and prosecutors, Zahrey alleged that the defendants had deprived him of liberty by coercing two witnesses, Lisa Rivera and Sidney Quick, to testify falsely against Zahrey before a grand jury, thereby resulting in his pretrial detention. *Id.* at 345–46.

On these facts, we held that Zahrey had adequately stated a claim under § 1983 for, inter alia, denial of his "right to a fair trial under the Fifth, Sixth and Fourteenth Amendments." *Id.* at 346. Unlike the plaintiff in *Ricciuti*, Zahrey eventually proceeded to trial before a jury in the Eastern District of New York, whereupon he was acquitted on all counts. *Id.* But our analysis of Zahrey's Due Process claim focused not on the events at his trial, but on the deprivation of liberty resulting from the purportedly coerced grand jury testimony. *See id.* at 348–49.

Finally, in *Garnett*, the court expressly rejected the dissent's argument, *post* at 4–7, that a challenge to the use of fabricated evidence pre-trial "is only cognizable as a claim for malicious prosecution or for false arrest under the Fourth Amendment, and not as an independent fair trial claim." 838 F.3d at 278. Rather,

36

we explained that "fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims," and that therefore "probable cause, which is a Fourth Amendment concept, should not be used to immunize a police officer who violates an arrestee's non-Fourth Amendment constitutional rights." *Id.*[13]

Taken together, then, *Garnett*, *Zahrey*, and *Ricciuti* establish that the (perhaps imprecisely named) fair trial right protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury*. *See Zahrey*, 221 F.3d at 355 ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."). And we have expressly distinguished this right from the separate, although related, right not to be convicted based on the use of false

---

[13] To be sure, in *Garnett* itself, the defendant stood trial. 838 F.3d at 270. But we never suggested that fair trial claims are limited to such cases; to the contrary, we repeatedly emphasized that the elements of a fair trial claim are only that the officer fabricated information that would be likely to influence a jury's verdict, forwarded the information to prosecutors, and thereby deprived the defendant of liberty. *Id.* at 279. And we based this rule largely on *Ricciuti*, *id.* at 277, 279–80, which, as already discussed, did not involve the presentation of false evidence at trial.

evidence *at trial*. *See id.* ("It has also long been established that a prosecutor who knowingly uses false evidence at trial to obtain a conviction acts unconstitutionally.").

In the instant case, Frost raises a genuine dispute of material fact as to whether he was thus deprived of his liberty. As explained above, there is a triable question as to whether Vega's identification of Frost was coerced. Similarly, there is a triable question as to whether Vega's identification would likely have influenced the jury at Frost's criminal trial given that Vega, unlike McLaurin, was not Frost's fellow suspect. These two facts, in turn, create a genuine dispute as to whether Vega's identification "critically influenced" the decision to prosecute Frost, *Garnett*, 838 F.3d at 277, thereby resulting in a deprivation of his liberty.

*Dufort v. City of New York* does not compel a different result. The plaintiff's contention there was that the defendants "misrepresented or withheld key evidence *at his criminal trial*." 874 F.3d 338, 354 (2d Cir. 2017) (emphasis added). The court construed the plaintiff's claim as a "due process claim [that] rests [on] the right to have one's case tried based on an accurate evidentiary record that has not been manipulated by the prosecution." *Id.* at 355. Accordingly, we held that the plaintiff's claim failed as a matter of law because the defendants' attempts to

distort the record at his criminal trial had failed. *Id.* Concededly, it is undisputed here that Vega's allegedly coerced identification of Frost could not have "distort[ed] the record" at Frost's trial, *id.*, because Vega did not repeat this identification in his trial testimony. But Frost, unlike the plaintiff in *Dufort*, does not ground his due process claim in allegations that the defendants attempted to distort the record at his criminal trial; instead, he grounds his claim in allegations that the defendants fabricated evidence much earlier in the process and forwarded that evidence to prosecutors, thereby depriving Frost of his liberty. *Dufort* did not question the validity of such claims; to the contrary, it recognized, as did *Zahrey*, that the right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity" is distinct from the right not to be tried based on "a distorted evidentiary record being presented to the jury." *Id.* at 354–55.

It is true that *Dufort* states that "[m]ere attempts to withhold or falsify evidence cannot form the basis for a § 1983 claim for a violation of the right to due process when those attempts have no impact on the conduct of a criminal trial." *Id* at 355. But this characterization must be read in light of the claim presented in that case, which, again, was directed exclusively to the presentation of evidence at trial.

39

We do not think *Dufort* can be read to hold that *no* due process claim based on the falsification of evidence can be maintained unless the evidence affects the ultimate criminal trial. Such a holding would be inconsistent with *Zahrey*—a case on which *Dufort* relies, *id.* at 354–55—as well as with *Ricciuti*.[14]

Because we conclude that there is a triable issue as to whether defendants coerced Vega into falsely identifying Frost, and as to whether Vega's identification resulted in Frost's prosecution, Frost's due process claim should not have been dismissed.[15] To be clear, we offer no view as to the ultimate outcome. We conclude only that there are triable issues of fact such that resolution at summary judgment is not appropriate.

---

[14] The Supreme Court's holding in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), relied upon by the dissent, *post* at 6–8, does not compel a different result. In *Manuel*, the Supreme Court held that a § 1983 plaintiff could challenge his pretrial detention based on purportedly fabricated evidence under the Fourth Amendment, even after a judge determined that this evidence constituted probable cause. 137 S. Ct. at 914–15. But just as a Fourth Amendment claim survives the initiation of "legal process," *id.* at 914, our precedents establish that a fair trial claim under the Due Process Clause may accrue before the trial itself. Accordingly, the holding of *Manuel* does not preclude Frost's fair trial claim.

[15] As noted above, the district court on remand should address Frost's argument that defendants also deprived him of due process by failing to forward exculpatory evidence to prosecutors. In addition, the district court may wish to clarify which defendants remain implicated, at this stage in the litigation, by Frost's due process claim.

## IV. Excessive Force

Along with safeguarding a criminal defendant's right to a fair trial, "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). An officer's actions can amount to punishment if they are taken with "an expressed intent to punish." *Bell v. Wolfish*, 441 U.S. 520, 538 (1979). But even "in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

To determine whether an officer used excessive force, the factfinder must apply an "objective reasonableness" standard that "turns on the facts and circumstances of each particular case." *Id.* This standard should be applied "from the perspective and with the knowledge of the defendant officer," *id.* at 2474, and it should account for such factors as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and

41

whether the plaintiff was actively resisting," *id.* at 2473. The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Id.* at 2474.

"Additionally, an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a clearly established right, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*[16] "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus . . . officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam). "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Id.*

---

[16] In contrast with Frost's malicious prosecution and due process claims, defendants have raised a qualified immunity defense to Frost's excessive force claims.

The district court dismissed Frost's excessive force claims arising out of the incidents that occurred on October 9, 2012, January 16, 2013, and July 16, 2013. *Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323, at *10–11 (S.D.N.Y. Mar. 27, 2019).[17] Frost challenges each of these decisions on appeal. For the reasons below, we agree with Frost that the district court erred in dismissing the claims arising out of the October 9 and July 16 incidents, but we conclude that dismissal of the claim arising out of the January 16 incident was warranted.

## A.    October 9, 2012 Incident

Beginning with the first incident, the following facts are undisputed. On October 9, 2012, Frost was brought to Bronx Supreme Court for an attorney visit, and while there he was escorted by correction officers Jemmott and Joye. At some point, Frost said to Jemmott, "I should spit in your fuckin' face." J.A. 609:16–17.[18]

---

[17] The district court also held that Frost failed to create a triable issue with respect to an incident that took place on July 25, 2012, *see Frost*, 2019 WL 1382323, at *9–10, but Frost does not appeal that ruling.

[18] When asked during his deposition whether he had said that he should spit in Jemmott's face, Frost responded, "I don't—I don't recall saying that, but—I never spit in his face, but if I was mad, I possibly did." J.A. 1552:23–24. On appeal, Frost argues that this equivocal response creates a genuine dispute as to whether he made the comment to Jemmott. We disagree, but for the reasons discussed in the main text, we nevertheless conclude that Frost has created a genuine dispute as to whether Jemmott and Joye used excessive force during the October 9 incident.

43

Jemmott then took Frost to the ground, and either Jemmott or Joye kicked Frost in the ribs. Jemmott and Joye also dragged Frost on the ground by his leg shackles, and Frost was later taken to a medical clinic, where he was diagnosed with a ruptured eardrum and bruising on his forehead and cheek.

In dismissing Frost's claim, the district court explained that Frost "had established himself as a violent inmate whose threats against DOC officers needed to be taken seriously." *Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323, at *10 (S.D.N.Y. Mar. 27, 2019). And the district court approvingly cited other decisions in which district courts had dismissed excessive force claims brought by inmates who had spit or attempted to spit on correction officers. *Id.* (citing *Coleman v. Hatfield*, No. 13-CV-6519-FPG, 2016 WL 2733522 (W.D.N.Y. May 10, 2016); *Smolen v. Dildine*, No. 11-CV-6434-CJS, 2014 WL 3385209 (W.D.N.Y. July 9, 2014); *Bonet v. Shaw*, 669 F. Supp. 2d 300 (W.D.N.Y. 2009)). The district court stated, moreover, that Frost had "suffered relatively minor injuries in the course of his struggle with" Jemmott and Joye. *Id.* at *10 n.28. For these reasons, the district court concluded, Jemmott and Joye "used objectively reasonable force to protect themselves from plaintiff's threat." *Id.* at *10.

After reviewing the record below, we respectfully disagree with the district court's reasoning in several respects. First, we think it is at least questionable at this stage whether Frost's statement can be characterized as a "threat." Notably, Jemmott testified only that Frost said that he "should" spit on Jemmott. J.A. 609:16. Although it is possible that this statement would have been interpreted as a threat—that Frost was planning to spit on Jemmott—it is also possible that it would have been interpreted as an insult or an expression of disdain—that Frost wanted to spit on Jemmott, or that he believed he would be justified in spitting on Jemmott. Because we are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004), we must assume at this stage in the litigation that a reasonable officer in Jemmott's position would have adopted the latter interpretation.

For similar reasons, we find the instant case distinguishable from those cited by the district court in which inmates spat or attempted to spit on correction officers.[19] During his deposition, Frost categorically denied attempting to spit on

---

[19] The instant case is also distinguishable from *Berman v. Williams*, No.

45

Jemmott. And while defendants argue that "it is undisputed that . . . Frost had 'bec[o]me combative' and 'turned his body towards [Jemmott],'" Appellees' Br. 45 (quoting J.A. 609:15–16) (alterations in original), Frost testified to the contrary that any resistance to Jemmott was caused by physical restraints that limited Frost's mobility.[20] Even assuming, then, that the cases cited by the district court were correctly decided, there is a genuine dispute here as to whether Frost either spat or attempted to spit on Jemmott.

---

17cv2757 (JGK), 2019 WL 4450810 (S.D.N.Y. Sept. 17, 2019). Defendants cite *Berman* for the proposition that summary judgment is appropriate where officers use force in response to an inmate's threat to spit. But the court in *Berman* did not address the merits of the excessive force claim at issue, and it granted summary judgment in favor of defendants only because they were not alleged to have been personally involved in the spitting incident. *Id.* at *3–5.

[20] Defendants argue that Frost is estopped from denying that he threatened Jemmott because Frost pled guilty to creating a disturbance during the October 9 incident. But defendants have put forth no evidence that Frost represented, in connection with his plea, that he had threatened Jemmott. Instead, defendants cite to a portion of Frost's deposition in which Frost said he believed he had pled guilty to creating a disturbance or refusing a direct order. Notably, Frost also said that he believed he had not pled guilty to assaulting a staff member. And on appeal, Frost points to documents in the record that suggest that he never entered a plea at all in connection with the October 9 incident, but that he was instead found guilty after failing to attend his disciplinary hearing, and that even this finding was later expunged.

Finally, we differ with the district court's suggestion that Frost's injuries were minor. As noted above, Frost was diagnosed not only with multiple facial bruises following the October 9 incident, but also with a ruptured eardrum. Defendants argue that Frost had previously been diagnosed with a ruptured eardrum the year prior and that he therefore failed to show that Jemmott and Joye caused him a new injury. But this is pure speculation, and absent undisputed medical evidence to the contrary—which defendants have not offered—a reasonable jury could find that Jemmott and Joye were responsible for causing a new rupture.

We are left, then, with the following question: assuming that a reasonable officer would have interpreted Frost's spitting statement as an insult rather than a threat, and assuming that Frost was not actively resisting Jemmott and Joye, was it excessive for the officers to tackle, kick, and drag Frost, thereby bruising his face and rupturing his eardrum? We conclude that it was.[21] Indeed, while we are

---

[21] In addition to raising the points above, defendants resist this conclusion by arguing that Frost did not sustain significant injuries from being kicked in the ribs or dragged across the floor. But even assuming this is true, the extent of an inmate's injuries, while relevant to the excessive force inquiry, is not dispositive. *Cf. Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (recognizing, in the Eighth Amendment context, that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune

mindful to view the incident with "deference to [the] policies and practices needed to maintain order and institutional security," *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015), our caselaw makes clear that it is unconstitutional for officers to strike an individual who is compliant and does not pose an imminent risk of harm to others, *see, e.g.*, *Rogoz v. City of Hartford*, 796 F.3d 236, 247–48 (2d Cir. 2015) (plaintiff created triable issue regarding excessive force based on evidence that defendant jumped on his back while plaintiff was compliant and lying prone on the ground); *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (plaintiff stated claim for excessive force where he alleged, inter alia, that defendants punched him in the face while plaintiff's arms were shackled); *Bellows v. Dainack*, 555 F.2d 1105, 1106 & n.1 (2d Cir. 1977) (plaintiff stated claim for excessive force where he alleged that defendant punched him in the ribs while plaintiff was seated in the back of a police car). This is true even where an excessive force plaintiff has a history of aggressive behavior,[22] as an alternative rule would place few restrictions on officers' treatment of individuals with extensive disciplinary records.

---

to escape without serious injury").

[22] It is unclear from the record whether Jemmott and Joye were aware of Frost's disciplinary history. Although there is evidence that Red ID inmates like Frost sometimes wore identifying restraints, there appears to be no indication as to whether Frost was wearing such restraints on October 9. Jemmott testified

In reaching this conclusion, we of course take no position on the ultimate issue whether Jemmott and Joye used excessive force in subduing Frost. We hold only that the undisputed facts are insufficient at this stage in the litigation to support a ruling in favor of defendants. Moreover, as just noted, it was clearly established at the time of the incident that an officer could not strike an individual who was compliant and did not pose an imminent risk of harm to others. Because a reasonable jury could find that Frost was neither threatening nor resisting Jemmott and Joye at the time of the incident, summary judgment on defendants' qualified immunity defense is also unwarranted. *See Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain . . . .").[23]

during his deposition, moreover, that he did not recall any previous encounters with Frost.

[23] Because we hold that there is a triable issue as to whether Jemmott and Joye used excessive force during the October 9 incident, we do not address the relevance, if any, of Frost's arguments regarding non-party Correction Officer Williams.

**B. January 16, 2013 Incident**

Although we conclude that triable issues prevent summary judgment on Frost's excessive force claim arising out of the October 9 incident, we agree with the district court's decision to dismiss the claim arising out of the January 16 incident. As noted above, Frost alleges that defendants used excessive force to extract him after he allegedly secreted a weapon in his anal cavity. The district court granted summary judgment in favor of defendants after deciding that video footage of the incident showed that defendants used only reasonable force. *See Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323, at *11 (S.D.N.Y. Mar. 27, 2019). The district court explained, moreover, that Frost suffered de minimis injuries during the extraction. *Id.*

On appeal, Frost argues that the district court erred in its assessment of the record. As a preliminary matter, Frost asserts that there is a dispute as to whether he secreted a weapon in his anal cavity, or whether instead the weapon was planted on him by defendants. Even assuming he did secrete the weapon, Frost contends, defendants used excessive force by continuing to kick and punch him after he had been subdued.

We disagree with both of these arguments. First, as defendants note, Frost is judicially estopped from denying that he secreted the weapon. "Judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by that party in a prior legal proceeding." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015). Here, Frost was indicted in connection with the January 16 incident, and he pled guilty to promoting prison contraband in the second degree. As part of his allocution, Frost specifically admitted to possessing the weapon, and the court adopted that position in accepting his guilty plea. *See Kuar v. Mawn*, No. 08-CV-4401 (JFB) (ETB), 2011 WL 838911, at *6 (E.D.N.Y. Mar. 4, 2011) ("[U]nder the doctrine of judicial estoppel, the Court will preclude plaintiff from taking factual positions in this case which are directly contrary to statements that he made in connection with his plea and that were adopted by the court which accepted his plea."). As a result, Frost cannot now maintain that the weapon was planted on him by defendants.

Furthermore, we disagree with Frost's contention that defendants used excessive force during the extraction. As video footage of the incident makes clear, Frost resisted the officers and tried to prevent them from entering the area where he was located by holding the door shut with his arm. Frost then struggled with

51

the officers as they tried to restrain him. Given "the severity of the security problem at issue; the threat reasonably perceived by the officer[s]; and [the fact that Frost] was actively resisting," *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015), defendants were justified in using nontrivial amounts of force. And although perhaps the struggle between Frost and the officers could have been gentler, the video footage does not suggest that the officers' actions could reasonably be viewed as excessive. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [detainee]'s constitutional rights."). Accordingly, we conclude that the district court was correct to dismiss Frost's claim arising out of the January 16 incident.

## C. July 16, 2013 Incident

Finally, we consider Frost's excessive force claim arising out of the July 16 incident, during which Frost was extracted from the CPSU recreation yard after he and eighteen other inmates refused to come inside. As with the January 16 incident, the district court granted summary judgment in favor of defendants based on its assessment that Frost's injuries were minor and that the video footage showed as a matter of law that defendants used reasonable force to extract him.

*Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323, at *11 (S.D.N.Y. Mar. 27, 2019). After reviewing the footage, we agree with the district court that defendants acted reasonably in restraining Frost initially, but we hold that a triable issue remains as to whether members of the extraction team used excessive force after Frost was subdued.

We reject at the outset Frost's argument that it was inappropriate for defendants to extract him from the recreation yard because he and his fellow inmates were trying to secure a meeting with a senior prison official. It is undisputed that the inmates refused to leave the recreation yard after their allotted hour of recreation time was over. It is also undisputed that the correctional facility is not secure if inmates do not return from the yard. And it is further undisputed that correction officers spent hours trying to convince the inmates to come inside before assembling an extraction team. Given that we "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate," *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015), we conclude that Frost has not created a genuine dispute as to whether extraction was appropriate.

Furthermore, even if extraction were inappropriate, Frost's actions justified defendants in using a considerable amount of responsive force. As noted above, video footage of the incident shows that Frost prepared for the extraction team's arrival by positioning himself in a charging stance and using his ripped clothing as elbow pads and a mouth guard. When the extraction team opened the door to his pen, Frost charged the officers immediately and ended up on top of one of them. And although the officers managed to restrain Frost, they did so only after a vigorous struggle. As with the January 16 incident, this struggle was violent, but we agree with the district court's assessment that no reasonable jury could find that defendants' initial use of force was excessive. *Frost*, 2019 WL 1382323, at \*11.

We are less sure, however, about the propriety of defendants' conduct after Frost was subdued. As noted above, it was clearly established at the time of the incident that an officer cannot strike an individual who is compliant and does not pose an imminent risk of harm to others. *Cf. Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) ("[S]ummary judgment has been found inappropriate in a case involving the use of gratuitous force beyond what was necessary to subdue."). Frost argues on appeal that "he was pummeled and kicked after the extraction team subdued him and restrained his legs." Appellant's Br. 47. And although

defendants deny these allegations, video footage of the July 16 incident appears to show one of the members of the extraction team repeatedly moving his knee toward Frost's head after Frost was restrained. Moreover, other inmates can be heard in the background yelling for the officer to stop kicking Frost in the head. Based on this footage, we believe that there is a triable issue both as to whether the officer used excessive force and as to whether qualified immunity is warranted. We therefore conclude that the district court erred in dismissing Frost's claim arising out of the July 16 incident.[24]

## V.   Municipal Liability

Under the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), local governments may be held liable in § 1983 actions. "To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). "*Monell* does

---

[24] On remand, the district court may be unable to ascertain the identity of the officer in question, or of any other individual defendants who can be held liable in connection with the July 16 incident. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). The district court may nevertheless consider evidence regarding the July 16 incident in connection with Frost's municipal liability claims.

not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

The district court dismissed Frost's municipal liability claims because it concluded that he had failed to show the existence of any independent constitutional violations. *Frost v. City of New York*, No. 15 Civ. 4843 (NRB), 2019 WL 1382323, at *12 (S.D.N.Y. Mar. 27, 2019). As discussed above, however, we hold that Frost has created a triable issue regarding his due process claim and two of his excessive force claims. Because the district court is best suited to address the merits of Frost's municipal liability claims in the first instance, we vacate the dismissal of those claims and remand for further consideration in light of this opinion. *See Darnell v. Pineiro*, 849 F.3d 17, 39 (2d Cir. 2017).

## CONCLUSION

For the reasons above, we **AFFIRM** the district court's dismissal of Frost's malicious prosecution claim and his excessive force claim arising out of the January 16 incident; we **REVERSE** the district court's dismissal of Frost's due

56

process claim and his excessive force claims arising out of the October 9 and July 16 incidents; we **VACATE** the district court's dismissal of Frost's municipal liability claims; and we **REMAND** the case for further proceedings consistent with this opinion.

KEARSE, *Circuit Judge*, dissenting in part:

I respectfully dissent from so much of the majority opinion as holds that the district court erred in dismissing the claims of plaintiff Jarrett Frost against defendants Richard Spennicchia and Joseph O'Neil (the "Officers") for the alleged denial of his "substantive due process" "right to a fair trial." Majority Opinion *ante* at 22 (internal quotation marks omitted). While I agree that the district court could not properly grant summary judgment based on its assessment of Leon Vega's credibility, we are free to affirm a judgment "on any ground which finds support in the record, regardless of the ground upon which the trial court relied," *Leecan v. Lopes*, 893 F.2d 1434, 1439 (2d Cir.), *cert. denied*, 496 U.S. 929 (1990); and I do not see any genuine issue of material fact to be tried as to the claim that the Officers denied Frost a fair trial. There is of course a "constitutional right . . . to have one's case tried based on an accurate evidentiary record that has not been manipulated by the prosecution." *Dufort v. City of New York*, 874 F.3d 338, 355 (2d Cir. 2017) ("*Dufort*"). But while Frost claims that the Officers coerced Vega in 2011 to identify Frost as the person who had shot Vega's friend Mavon Chapman and thereby fabricated evidence against Frost, that alleged fabrication, if it occurred, could not have denied

1

Frost a fair trial because in 2014, "when [Frost] was put *on trial*, *Vega did not identify him*" (Frost's brief on appeal at 22 (emphasis added)).  As we have squarely held, where the allegedly fabricated evidence has not been replicated at trial, a due process claim of denial of a fair trial "fail[s] as a matter of law."  *Dufort*, 874 F.3d at 355.

In *Dufort*, the due process claimant asserted that police officers had denied him a fair criminal trial "by fabricating inculpatory evidence through an inappropriately suggestive lineup," *id*. at 347; at his criminal trial, however, the lineup witness stated the true, limited nature of her identification, and we affirmed the district court's dismissal of the fair-trial claim "as a matter of law" because the plaintiff had "not proved that the evidentiary record at his criminal trial was unfairly distorted," *id*.  "Mere attempts to withhold or falsify evidence cannot form the basis for a § 1983 claim for a violation of the right to due process when those attempts have no impact on the conduct of a criminal trial." *Id*. at 355 (citing *Zahrey v. Coffey*, 221 F.3d 342, 348-50 (2d Cir. 2000) ("*Zahrey*")).

In the present case, the majority expressly "[c]oncede[s]" that

> it is undisputed . . . that Vega's allegedly coerced identification
> of Frost *could not have 'distort[ed] the record' at Frost's trial*, [*Dufort*,

2

874 F.3d at 355], because Vega did not repeat this identification in his trial testimony."

Majority Opinion *ante* at 39 (emphasis mine). However, it seeks to distinguish *Dufort* by pointing out that "Frost . . . does not ground his due process claim in allegations that the defendants attempted to distort the record *at his criminal trial*," *id.* (emphasis mine). The majority acknowledges that Frost

> instead . . . grounds his claim in allegations that the defendants fabricated evidence much earlier in the process and forwarded that evidence to prosecutors, thereby depriving Frost of his liberty.

*Id.* But this recognition of the actual pretrial focus of Frost's claimed deprivation of liberty highlights my doctrinal difficulty with the majority's reinstatement of Frost's so-called fair-trial claim.

"'The first inquiry in any § 1983 suit' is 'to isolate the precise constitutional violation with which [the defendant] is charged,'" *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 140 (1979)). "'[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth . . . Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" *County of*

3

*Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)); *see, e.g., Graham v. Connor*, 490 U.S. at 395. Where a claim is "'covered by' the Fourth Amendment," "[s]ubstantive due process analysis is . . . inappropriate." *County of Sacramento v. Lewis*, 523 U.S. at 843.

Most recently, in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), the Supreme Court confirmed that an accused alleging the fabrication of evidence against him "may challenge his pretrial detention on the ground that it violated the Fourth Amendment," *id*. at 914, and held that lower court decisions that the petitioner should instead have "challenge[d] his pretrial confinement via the Due Process Clause," *id*. at 916, were error, *see id*. at 919. The Supreme Court noted that the petitioner, following a hearing to determine whether there was probable cause for his postarrest detention, *see id*. at 915, had been

> held in jail for some seven weeks after a judge relied on allegedly fabricated evidence to find probable cause that he had committed a crime. The primary question in this case is whether Manuel may bring a claim based on the Fourth Amendment to contest the legality of his pretrial confinement. *Our answer follows from settled precedent. The Fourth Amendment, this Court has recognized, establishes "the standards and procedures" governing pretrial detention. See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).

4

*Manuel*, 137 S. Ct. at 914 (emphasis mine).

There is no suggestion, of course, that the existence of probable cause in compliance with the Fourth Amendment would be a defense against the use of fabricated evidence at trial.

> [O]nce a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause . . . .

*Manuel*, 137 S. Ct. at 920 n.8. But the "[Fourth] Amendment, standing alone, guarantee[s] *a fair and reliable determination of probable cause* as a condition for any significant *pretrial* restraint," *Manuel*, 137 S. Ct. at 917-18 (internal quotation marks omitted) (emphases mine); *see id*. at 918-19 ("The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause. . . . That can happen when the police hold someone without any reason before the formal onset of a criminal proceeding. *But it also can occur when legal process itself goes wrong--when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements. Then*, too, a person is confined without constitutionally adequate justification. Legal process has gone forward, but it has

5

done nothing to satisfy the Fourth Amendment's probable-cause requirement." (emphases added)).

The majority in the present case, in concluding that summary judgment dismissing Frost's substantive due process fair-trial claims was error, relies principally on two cases, *Zahrey* and *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997) ("*Ricciuti*"). I disagree with the majority's view that the claim upheld in *Zahrey* was one for denial of a fair trial; and while I do not disagree with *Ricciuti*'s conclusion that the plaintiffs there had asserted a viable constitutional claim for unwarranted prolonged pretrial detention, I view its conclusion that the plaintiffs had a viable due process claim for denial of their right to a fair trial--in a case in which the charges against them were dismissed without a trial--as contrary to the Supreme Court's instruction that claims of pretrial deprivations should be analyzed under the Fourth Amendment.

*Zahrey*:

In *Zahrey*, in which the plaintiff had been acquitted after trial, we concluded that the plaintiff adequately pleaded a claim for deprivation of his liberty prior to trial, not a claim for denial of a fair trial. Although the majority states that "Zahrey

6

alleged that the defendants had deprived him of liberty by coercing two witnesses . . . to testify falsely against [him] before a grand jury, thereby *resulting in his pretrial detention*," and states that "[o]n these facts, we held that Zahrey had adequately stated a claim under § 1983 for . . . denial of his '*right to a fair trial*,'" Majority Opinion *ante* at 36 (quoting *Zahrey*, 221 F.3d at 346 (emphases mine)), we did not find that he had stated a claim for denial a fair trial.  The above *Zahrey* language quoted by the majority was part of our quotation of Zahrey's own characterizations of his claims. And rather than adopting his characterizations, we proceeded to "consider first *the existence of the right Zahrey contends was violated* and the related issue of whether his deprivation of liberty was *a legally cognizable result* of [the prosecutor's] alleged misconduct." *Zahrey*, 221 F.3d at 348 (emphases added); *see*, *e.g.*, *Graham v. Connor*, 490 U.S. at 394.

In the ensuing section titled "Identifying the Right," *Zahrey*, 221 F.3d at 348-49, we concluded that Zahrey alleged a deprivation of liberty, and that his "liberty deprivation [wa]s the eight months he was confined, from his bail revocation (after his arrest) to his acquittal," *id.*; *see also id*. at 349 ("*the right at issue in this case is appropriately identified as the right not to be deprived of liberty as a result of the fabrication*

7

*of evidence by a government officer acting in an investigating capacity.  Understood this way*, we conclude that the right at issue is a constitutional right, *provided that the deprivation of liberty of which Zahrey complains can be shown to be the result of [the prosecutor's] fabrication of evidence*." (emphasis added)).

We did not say that Zahrey had adequately pleaded a claim for denial of a fair trial.  Indeed, focusing on the absence of any right to recover for misconduct that has not caused injury, we suggested that no claim for denial of a fair trial would be cognizable where--as in *Zahrey*--the criminal trial ended in an acquittal.  *See, e.g., id*. at 350 ("If, for example, a prosecutor places in evidence testimony known to be perjured . . . , *no deprivation of liberty occurs unless and until the jury convicts and the defendant is sentenced*." (emphasis added)); *id*. at 348 (the constitutional right at issue is not simply the "right not to have a prosecutor manufacture false evidence. . . . *The manufacture of false evidence, in and of itself, . . . does not impair anyone's liberty*, and therefore does not impair anyone's constitutional right." (internal quotation marks omitted) (emphases mine)).

Thus, we noted that "Justice Scalia foreshadowed Zahrey's claim when he observed:  'I am aware of[ ] *no authority* for the proposition that *the mere preparation*

of false evidence, *as opposed to its use* in a fashion *that deprives someone* of a fair trial *or otherwise harms him*, violates the Constitution,'" *Zahrey*, 221 F.3d at 356 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 281 (1993) (Scalia, *J.*, concurring) (last emphasis in *Zahrey*; other emphases mine)). And we noted that "Zahrey's contention is that" by the prosecutor's misconduct "he ha[d] been '*otherwise* harm[ed].'" *Zahrey*, 221 F.3d at 356 (emphasis mine). The fabricated evidence had been "used by introducing it in evidence before the grand jury," following which "an indictment was . . . returned and Zahrey was later arrested," *id.*; and it was further used in opposition to Zahrey's motion for bail, *see id.* at 347. Accordingly, Zahrey's "liberty deprivation *[wa]s the eight months he was confined*, from his bail revocation (after his arrest) to his acquittal . . . ." *Id.* at 348 (emphasis added).

*Ricciuti*:

In *Ricciuti*, the plaintiffs, who had been arrested for assault, claimed that police officers fabricated a confession that indicated racial animus on the part of one of the plaintiffs. Our opinion stated that

> [l]ike a prosecutor's knowing use of false evidence to obtain a
> tainted conviction, a police officer's fabrication and forwarding
> to prosecutors of known false evidence works an unacceptable
> "corruption of the truth-seeking function of the trial process,"

9

124 F.3d at 130 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976); and citing

*Giglio v. United States*, 405 U.S. 150, 153 (1972); *Mooney v. Holohan*, 294 U.S. 103, 112

(1935)), and we added that

> [w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he *violates the accused's constitutional right to a fair trial*, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983,

*Ricciuti*, 124 F.3d at 130 (emphasis added).

But *Agurs*, *Giglio*, and *Mooney* were all cases that had been decided after trial.

In *Ricciuti*, the criminal charges had in fact been dismissed without a trial because

the officer who reported the allegedly fabricated confession repeatedly failed to

comply with a pretrial discovery order. *See Ricciuti*, 124 F.3d at 127. The trial

process was not corrupted; there was no trial.

The real nature of the *Ricciuti* plaintiffs' complaints--and what gave them a

cognizable constitutional claim--was apparently that as a result of the allegedly

fabricated confession, their assault charges were reclassified as bias-related:

"Because of the seriousness of the charges against them, plaintiffs were ineligible

for release on desk appearance tickets, and were forced to remain in jail for more

than 30 hours from April 30 until near midnight on May 1, 1989 when they were released on their own recognizance." *Id*. at 126.

Thus, in *Ricciuti*, there was probable cause for the plaintiffs' arrests for assault. But if the confession was fabricated, there was not probable cause for the increase of the charges to the aggravated crimes of bias, the aggravated crimes being the apparent basis for keeping the plaintiffs detained for 30 hours rather than releasing them as would otherwise have occurred. Accordingly, the allegedly fabricated confession resulted in the deprivation of the plaintiffs' liberty for 30 hours.

I think it clear in light of *Manuel*--which was based on settled Supreme Court precedent, some of which preceded *Ricciuti*--that *Ricciuti* should have addressed the claim it was upholding not as a due process claim for denial of a fair trial, but rather as a Fourth Amendment claim for unduly prolonged deprivation of the plaintiffs' pretrial liberty. The source of plaintiffs' right was the Fourth Amendment since only their pretrial liberty had been curtailed, not their right to fairness in a trial that was not held.

The *Ricciuti* panel's "entirely different mode of analysis" to approve of a due process fair-trial claim in a case in which there was no trial at all, Majority Opinion *ante* at 36, did not comply with the requirement that our "first inquiry in any § 1983 suit" be to identify "the precise constitutional violation with which [the defendant] is charged," *Graham v. Connor*, 490 U.S. at 394 (internal quotation marks omitted), or with the principle reaffirmed in *Manuel* that claims of deprivation of liberty prior to trial are to be analyzed under the Fourth Amendment rather than under general principles of substantive due process.

*Dufort*:

As noted above, the majority overturns the district court's grant of summary judgment dismissing Frost's claim for denial of a fair trial in which the evidence he alleges was fabricated was not presented, despite our holding in *Dufort* that such a claim should be dismissed as a matter of law. The majority states that *Dufort* is distinguishable because Frost's claim is that he was deprived of liberty "much earlier" than at trial because the Officers allegedly coerced Vega to identify Frost as Chapman's shooter and sent that information to the prosecutor. Majority Opinion *ante* at 39. But that claim is one that should simply be analyzed under the Fourth

12

Amendment. Such analysis, however, reveals one aspect in which *Dufort* is distinguishable, *i.e.*, the quality of the evidence leading to the respective prosecutions of Dufort and Frost, for a pretrial detention following the fabrication of evidence violates the Fourth Amendment only if without the "fabricated evidence . . . probable cause is lacking," *Manuel*, 137 S. Ct. at 920 n.8.

In *Dufort*, the summary dismissals of Dufort's claims of false arrest and malicious prosecution were vacated, *see Dufort*, 874 F.3d at 343, 349-51, and those claims were remanded for further proceedings because there existed genuine issues of material fact. We held that "the undisputed evidence . . . was" neither "sufficient to establish probable cause to arrest as a matter of law," *id*. at 349, nor "sufficient to establish probable cause for a criminal prosecution," *id*. at 351.

In the present case, in contrast, we affirm (unanimously) the district court's grant of summary judgment dismissing Frost's malicious prosecution claims in light of three undisputed facts: (1) that "Frost had a motive to retaliate against Chapman" for an assault on Frost "by Chapman's friends the night before," (2) that Frost and John McLaurin were in "the stairwell from which Chapman was shot, immediately after Chapman was shot," and (3) that "McLaurin identified Frost as the shooter,"

13

Majority Opinion *ante* at 19.  We all agree "as a matter of law" based on "*these*

undisputed facts"--which contain no reference whatsoever to any statement by

Vega--that "*a reasonably prudent person would have been led to believe that Frost was*

*guilty of shooting Chapman*," Majority Opinion *ante* at 19 (emphases added).  That

was more than ample probable cause for Frost's arrest, detention, and prosecution.

In reversing the dismissal of the fair-trial claim, the majority posits that "a

reasonable jury could have found *that Vega's identification critically influenced the*

*decision to prosecute* Frost," Majority Opinion *ante* at 33 (internal quotation marks

omitted (emphasis mine)), or that "a reasonable jury could have found *that the*

*decision to prosecute Frost would have been different if McLaurin*, who was Frost's fellow

suspect, *was the only person to identify him*," *id*. (emphases mine).  In light of the

record, I do not see that any reasonable juror could answer either question in the

affirmative, or even that these questions could properly be submitted to a jury,

given the majority's own recounting of the three undisputed facts quoted above--in

which the only identification of Frost as the shooter was that by McLaurin and there

was no consideration of any statement by Vega--that support our unanimous

conclusion that Frost's malicious prosecution claims were properly dismissed

14

because "as a matter of law . . . a reasonably prudent person would have been led to believe that Frost was guilty of shooting Chapman," Majority Opinion *ante* at 19.

And while the majority also states that "there is a triable question as to *whether Vega's identification would likely have influenced the jury at Frost's criminal trial*," Majority Opinion *ante* at 38 (emphasis added), posing such a question would be entirely speculative, if not mind-boggling, because its premise is negated by the actual events:  Vega did not identify Frost at the trial.

In sum, even if it were proven that the Officers fabricated Vega's 2011 identification of Frost as the shooter as alleged, the undisputed evidence without reference to the Vega identification forecloses any claim by Frost for deprivation of his liberty prior to trial.  And we are in agreement that

> it is undisputed here that *Vega's allegedly coerced identification of Frost could not have "distort[ed] the record" at Frost's trial*, [*Dufort*, 874 F.3d at 355], *because Vega did not repeat this identification in his trial testimony*,

Majority Opinion *ante* at 39 (emphases mine).  In my view the majority's reinstatement of Frost's claim that he was denied a fair trial is thus without legal or factual foundation.

15

This case is not meaningfully distinguishable from *Dufort*, and I would affirm the grant of summary judgment dismissing the due process claims of denial of a fair trial.